**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **HELEN ANN MANGAN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 7203 |
| v. | ) | |
| | ) | Magistrate Judge Daniel G. Martin |
| **CAROLYN COLVIN,** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Helen Mangan ("Plaintiff" or "Mangan") seeks judicial review of a final decision of Defendant Carolyn Colvin, the Commissioner of Social Security ("Commissioner").  The Commissioner denied Plaintiff's application for Supplemental Security Income benefits under Title II of the Social Security Act, and Mangan filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision.  The Commissioner filed a cross-motion.  The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment.  28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c).  For the reasons stated below, both motions are granted in part and denied in part.

## I.  Legal Standard

### A.  The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled.  An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional ability to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if

he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

**B.  Standard of Review**

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  <u>Background Facts</u>

**A.  Medical History**

Mangan claims that she became disabled in November 2009 when she allegedly became blind.  (R. 105).  In November 2009, she saw neuro-ophthalmologist Dr. John Pula

for complaints of photosensitivity, blurred vision, and right eye pain with movement.[1]  Her distance vision was measured as 20/50.  Dr. Pula noted that Mangan had also begun experiencing numbness in her left hand in September 2009.  He diagnosed Mangan with optic neuropathy OD, possible optic neuritis, and left arm numbness that might be related to her optic problems.  Dr. Pula recommended that she receive an MRI of her brain.  (R. 246).

The MRI indicated lesions of white matter in Mangan's brain that suggested a number of possible disorders, including multiple sclerosis ("MS").  (R. 304).  Plaintiff followed up with Dr. Pula in December.  He noted that her optic neuropathy suggested that Mangan was at high risk for developing MS.  As a result, he began her on immunomodulatory therapy by prescribing the interferon beta-lb medication Betaseron. (R. 248).  Dr. Pula noted in January 2010 that Mangan was fatigued, but she had not experienced a new MS attack.  (R. 428).  He diagnosed her with relapsing/remitting MS.  By March 2010, Plaintiff's vision had returned to 20/20 in both eyes, and her visual fields had improved.  Dr. Pula concluded that Mangan's optic neuritis had been resolved.  (R. 400).  No new MS attacks appeared by June 2010, though Plaintiff did experience some back pain and arm/leg numbness.  Mangan had no photophobia, exhibited normal strength, and was fully ambulatory.  (R. 430).

Ophthalmologist Dr. James Knupp agreed in October 2010 that Mangan's vision had fully returned to the 20/20 level and that MS was the most likely diagnosis for her condition.

---

[1]  The ALJ misidentified Plaintiff's physician as Dr. Gary Finkelstein.  The record in question was written by Dr. Pula to Dr. Finkelstein.  In addition, Mangan started treatment at the Illinois Neurological Institute when she first saw Dr. Pula, not in January 2010 as the ALJ stated.  (R. 23, 404).

He concluded that no further ophthalmologic intervention was necessary. (R. 445). At her January 2011 follow up, Dr. Pula again stated that Mangan was experiencing headaches and had not obtained relief through a variety of medications. However, her ability to walk was normal without assistance, and she exhibited a strength level of 5/5 for all major muscle groups. Her gait was also normal. No positive Romberg signs, which measure the body's sense of positioning, were seen. (R. 428).

Dr. Pula did not associate Mangan's muscular pain with MS. In February 2011, she saw her treating physician Dr. Jennifer Tieman, complaining of lower-back and mid-back pain that radiated to her ribs. Dr. Tieman noted a full range of motion in her back, though Mangan had some tingling on bending. She showed a 5/5 level of motor strength for her upper and lower extremities. (R. 474). An MRI exam of the lower spine only indicated a "small tiny focal disc protrusion." All other aspects of Mangan's spine were normal. (R. 454).

### B. Hearing Testimony

Mangan appeared at an April 9, 2011 hearing held before ALJ Patricia Supergan. Mangan was 27 years old, stood five feet and four inches high, and weighed 200 pounds. She stopped working in 2008 when she was laid off as a food packager. Plaintiff testified in brief terms that she performs few tasks around the house. Her boyfriend cleans and cooks meals. Plaintiff's neighbor helps get her children ready for school. She takes Betaseron for MS and Vicodin for headaches. Mangan described her headaches as severe. She needs to wear eyeglasses, but they broke two-and-a-half years ago. Plaintiff did not have them repaired. (R. 490-96).

### C.    Physician Reports

In February 2010, state agency physician Dr. Sandra Bilinsky issued a physical RFC assessment for Mangan, finding that she could work at the medium exertional level.  She could lift 50 pounds occasionally, and 25 pounds frequently.  Mangan was able to sit, stand, and walk about six hours in an eight-hour workday.  Dr. Bilinsky found that no other exertional or non-exertional restrictions were needed.  No environmental limitations were noted.  (R. 384-91).  Dr. Victoria Dow confirmed the RFC on reconsideration in April 2010.  (R. 422).

### D.    The ALJ's Decision

On April 29, 2011, ALJ Supergan issued a written decision that found Mangan was not disabled.  Using the familiar five-step process, the ALJ found at Step 1 that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of December 8, 2009.  Mangan's severe impairments at Step 2 were MS and obesity.  At Step 3, the ALJ found that neither of these impairments met or medically equaled a listing either singly or in combination.  Before moving to Step 4, the ALJ assessed Plaintiff's credibility and her RFC.  She found that Mangan's statements were not entirely credible.  However, the ALJ altered the state agency's RFC by deciding that Mangan could only work at the light exertional level.  This included additional restrictions concerning the avoidance of extreme heat and cold, humidity, machinery, and unprotected heights.  Mangan did not have any prior relevant work at Step 4.  Based on the testimony of a vocational expert, the ALJ found at Step 5 that a significant number of jobs existed in the national economy that Mangan could perform.  As a result, the ALJ concluded that Plaintiff was not disabled.

### III.   Discussion

Mangan contests the ALJ's decision on three grounds.  She claims that the ALJ: (1) erred at Step 3 by finding that her impairments did not meet or equal a listing; (2) improperly assessed her credibility; and (4) incorrectly determined her RFC.[2]  The Court addresses each of these arguments in turn.

### A.      The ALJ Did Not Err at Step 3

A claimant is presumptively disabled if he has an impairment or combination of impairments that meets or medically equals a listing.   An ALJ must satisfy three requirements when addressing a listing at Step 3.  The listing under consideration should be identified by name.  The ALJ must also consider a medical expert's opinion on the issue in question because the listings involve medical judgments.  *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (citation omitted).   Finally, the ALJ is required to provide an analysis of the listing issues that is "more than  . . . perfunctory."  *Id*. at 668.

The Court agrees with the Commissioner that the ALJ met all of these requirements.  She properly cited listing 11.09, which states that a claimant alleging disability based on MS must show a (1) disorganization of motor functioning as described in listing 11.04(B), (2) visual or mental impairment, or (3) significant, reproducible fatigue of motor functioning with substantial muscle weakness on repetitive activity.  20 C.F.R. Pt. 404, Subpt. P, App.1 at § 11.09.   The ALJ also cited listings 1.02 (joint deformities) and 1.03 (reconstructive surgery), though her reasons for referencing surgery are not entirely clear.  In addition, the

---

[2]  Plaintiff also refers briefly to the ALJ's Step 4 decision, though she does not appear to rely on it as a basis for error and does not address it in her reply.  The Court rejects any claim of error at Step 4 for the reasons stated in the Commissioner's motion.

ALJ mentioned obesity at Step 3. She did not cite a listing for that disorder because obesity is no longer a listed impairment.

The ALJ also considered medical opinions to support the Step 3 decision. She cited the medical opinions of the state agency physicians Dr. Bilinsky and Dr. Dow. Both experts signed Form SSA-831-C3 disability determination and transmittal letters concerning Mangan's MS and optic neuropathy. Social Security Ruling 96-6p states that such transmittal letters are evidence that an expert has considered the question of medical equivalence. *See* SSR 96-6p (referring to Form SSA-831-U3); *Ewing v. Astrue*, 2011 WL 3843692, at *7 (N.D. Ohio Aug. 12, 2011) (stating that an ALJ is entitled to rely on such forms as expert opinions on whether a claimant meets or equals a listing); *Hill v. Astrue*, 2009 WL 426048, at *9-10 (S.D. Ind. Feb. 20, 2009).

Mangan objects to the ALJ's reliance on the state agency physicians on three grounds. She first claims that the experts' opinions were not dispositive of the listing question. That is not a ground for remand because a medical expert's opinion is never decisive at Step 3, at least standing alone. Disability transmittal letters like the ones Drs. Dow and Bilinsky signed only establish that a physician has "considered" medical equivalence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The legal decision as to whether a claimant met or equaled a listing at Step 3 always remains with the ALJ herself, though she is entitled to rely on such expert opinions. *See* SSR 96-6p. Here, the ALJ properly considered the state-agency opinions when deciding the listing issue, as the regulations required her to do.

Second, Mangan claims that the ALJ was obligated to weigh the opinions of her treating physicians before she could rely on the state agency doctors. This argument is

unavailing because no treating physician provided a medical opinion that the ALJ could have weighed. Nor does Mangan point to anything in the record that she claims the ALJ should have considered on this topic. There are medical records from various physicians concerning Mangan's treatment and symptoms. But progress notes and test records do not constitute the kind of medical opinions that an ALJ is required to weigh. They are merely medical evidence that an ALJ must consider. As noted below, ALJ Supergan adequately reviewed Mangan's treatment records in this case.

Third, Plaintiff states as a variation of this argument that the ALJ failed to consider additional evidence on the listing issue that was provided after Drs. Bilinsky and Dow signed the transmittal letters. Again, however, Mangan fails to identify what this evidence is or explain how it would have led the ALJ to a different conclusion at Step 3. (Pl.'s Mot. at 8).

Plaintiff's essential argument appears to be that the ALJ's Step 3 discussion is too perfunctory to survive review. She rightly states that an ALJ may not rely solely on medical opinions at Step 3 when the ALJ fails to account for contradictory evidence in the record. *Scheck*, 357 F.3d at 700; *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *see also v. Astrue*, 327 Fed.Appx. 652, 655 (7th Cir. 2009). A perfunctory citation to state agency physicians that does not discuss contrary evidence can require remand.

That argument does not apply here because Mangan has not shown what contradictory evidence the ALJ failed to consider. Plaintiff notes that the ALJ's discussion of the medical record is not placed within the strict limits of the Step 3 finding; it occurs later in the decision as part of the credibility and RFC discussion. That is a common practice in cases of this type that can be confusing. However, it is not erroneous. The

Seventh Circuit has instructed courts "to read the ALJ's decision as a whole, [because] . . . it would be a needless formality to have the ALJ repeat substantially similar factual analyses at [different] steps[.]"  *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

The more important question is whether the ALJ's overall discussion adequately addressed her Step 3 finding.  The Court finds that it did.  The ALJ reviewed the record with considerable care.  She cited the criteria of listing 11.09 and specifically referenced numerous medical findings that support the Step 3 decision.  The ALJ noted, for example, that Mangan's visual acuity had returned to 20/20; she had experienced no new MS attacks; she had a 5/5 strength in all of her major muscle groups; she could ambulate effectively; and she had a full range of motion in her spine, with only a small disc protrusion shown in the spinal MRI.  Plaintiff has not presented any argument on why this was not sufficiently detailed to make the ALJ's discussion more than perfunctory.

Mangan further claims that the ALJ failed to consider the combined effects of her impairments.  An ALJ must evaluate the aggregate impact of all of a claimant's impairments, including those that are not found to be severe at Step 2.  20 C.F.R. § 404.1523.  The ALJ did so in this case, stating that Mangan did not have "an impairment or combination of impairments that meets or medically equals" a listing.  That was sufficient to satisfy the ALJ's obligation on this issue.  *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Plaintiff further contends that the ALJ erred by not setting out in detail all the factors involved in deciding if her obesity met or equaled a listing.  The Court disagrees.  The ALJ cited obesity at Step 3, though that condition is no longer a listed impairment.  *See* SSR 02-1p.  An ALJ is not required to spell out every aspect of what a listing includes.  Indeed,

an ALJ does not even err at Step 3 if he fails to identify the relevant listing, as long as his discussion of the evidence is not perfunctory.  *See Ribaudo*, 458 F.3d at 583.

Even if the ALJ should have stated the terms of SSR 02-1p (obesity) more carefully, Plaintiff has not shown why such an oversight amounts to more than harmless error. Under SSR 02-1p, obesity can be a medically determinable impairment at Step 2.  *Cf. Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).  It can also be a factor in the Step 3 assessment.  An obese claimant can meet a listing when his condition, in combination with obesity, satisfies the requirements for a particular listing.  That is because obesity can aggravate existing limitations.  *See* SSR 02-1p.  Obesity can also medically equal a listing on its own.  SSR 02-1p ("We may also find obesity, by itself, is medically equivalent to a listed impairment.").  As an example, SSR 02-1p states that a claimant whose obesity prevents him from ambulating effectively may meet the criteria for a listing that describes a major joint dysfunction.  Obesity substitutes for the joint condition in such a case.  A claimant can also equal a listing when the combined effect of multiple impairments, including obesity, is medically equivalent to a listing.  SSR 02-1p.

Plaintiff does not provide any argument, or cite any evidence, on why the ALJ should have reached a different conclusion on this issue.  She does not claim that the combined effects of MS and obesity met or equaled listing 11.09, nor does she identify any other listing that the ALJ should have considered.  Moreover, Mangan did not allege at the hearing that her weight exacerbated any of her limitations.  She also fails to make that argument in her briefs. Under these facts, the ALJ was not required to articulate her reasoning in greater detail.  *See Knox*, 327 Fed.Appx. at 655 ("[A] claimant first has the burden to present medical findings that match or equal in severity all of the criteria

specified by a listing.") (citation omitted); *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988); *Orienti v. Astrue*, 958 F. Supp.2d 961, 983 (N.D. Ill. 2013) ("[A]ny error in failing to mention obesity [at Step 3] is harmless if the claimant did not explain to the ALJ how her obesity aggravated her condition and rendered her disabled."); *Alesia v. Astrue*, 789 F. Supp.2d 921, 932 (N.D. Ill. 2011) ("An ALJ need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing.").

Remand is appropriate at Step 3 only when "the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review[.]" *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Plaintiff has not shown that is the case here. The Commissioner's motion is granted on the Step 3 issue.

## B.    The ALJ's Credibility Assessment is Not Erroneous

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's

credibility decision with deference and overturns it only when the assessment is patently wrong. *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Mangan argues that the ALJ erred by not addressing all of these factors.[3] However, an ALJ does not necessarily commit reversible error by not providing specific reasoning on each of SSR 96-7p's credibility factors. *Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999); *Brinkman v. Astrue*, 2013 WL 120250, at *8 (N.D. Ill. Jan 9, 2013). Plaintiff also claims that the ALJ did not assess all the evidence related to her symptoms. But an ALJ is never obligated to discuss every piece of evidence. She is only required to provide an accurate and logical bridge between the record and her conclusions. *Craft*, 539 F.3d at 673. Read in its totality, the ALJ's decision addressed all the major evidence concerning Plaintiff's MS and optic neuropathy.

Plaintiff next objects to the ALJ's use of boilerplate language stating that Mangan's allegations concerning her symptoms "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 22). Citing *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), Mangan claims that the ALJ incorrectly assessed her RFC before addressing her credibility. As *Bjornson* states, "[t]hat gets things backwards." *Id.* at 645. The Court agrees that the Commissioner's reliance on this frequently-quoted language is an ongoing problem in cases of this type. The Seventh Circuit has repeatedly criticized it in strong terms, and claimants raise objections to it almost without fail.

Notwithstanding, the boilerplate terms that Mangan objects to do not automatically make the credibility determination invalid. An ALJ errs in relying on such language when

---

[3] The Court notes that Mangan does not argue that the ALJ failed to properly consider her obesity as part of the credibility assessment.

13

he fails to provide a further explanation or an evidentiary basis for his conclusions. *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011); *Mueller v. Astrue*, 860 F. Supp.2d 615, 632 (N.D. Ill. 2012); *Dross-Swart v. Astrue*, 872 F. Supp.2d 780, 797 (N.D. Ind. 2012). It is not true, as Mangan claims, that the ALJ failed to indicate what evidence she considered. Her decision reviewed the medical record in some detail, including physician consultations, test results, and treatments. The ALJ also took into account Mangan's statements concerning her activities of daily living, her hearing testimony, and the absence of corroborating reports from her treating physicians.

Citing *Bjornson* once again, Plaintiff points out that an ALJ must take care in using a claimant's daily activities as a basis for finding that she is not credible. That is because ALJs often place undue emphasis on a claimant's capacity for undertaking relatively minimal activities. That was the case in *Bjornson*, where the ALJ discounted a claimant's credibility by improperly relying on the fact that he could walk up to one block, stand for 15 minutes, lift 10 pounds, and drive. *Bjornson*, 671 F.3d at 647.

The ALJ did make that error in this case. She only noted Plaintiff's earlier written statements on her activities as part of her general review of the record. (R. 23). Mangan overlooks that those daily activities were significantly broader than the ones that were present in *Bjornson*. The ALJ cited an April 2010 disability report in which Mangan stated that she undertakes "everything a mother does" for her four children, including preparing breakfast, lunch, and dinner. She also claimed to perform her regular daily duties. (R. 195-96). The ALJ did not draw a direct link between these activities and Plaintiff's credibility. She did find, however, that Mangan had tried to minimize her ability to engage

in daily life at the hearing, where she denied that she could clean the house, cook meals, or care for her children without help from her neighbor and her boyfriend.[4] (R. 24, 493-95). The ALJ determined that the objective record did not support the limitations that Mangan identified. Social Security Ruling 96-7p requires an ALJ to compare the consistency between a claimant's allegations and the medical record. *See* SSR 96-7p (stating that an ALJ "must consider . . . the degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment."). Mangan presents no argument on how the ALJ misconstrued the record on this issue.

Mangan's remaining arguments are more difficult to understand. She claims, for example, that the ALJ refused to accept that Mangan had MS. (Pl.'s Mot. at 6). That is plainly not the case. The fact that the ALJ considered MS at Steps 2 and 3 necessarily means that she recognized the condition. It is true that the ALJ did not accept that Mangan's symptoms were as severe as she claimed, but that is different from refusing to acknowledge that Plaintiff has MS. Mangan alleged that her main MS limitations involved periodic numbness in her limbs. (R. 164). The ALJ acknowledged that complaint. (R. 22). She simply did not find that it rendered Plaintiff totally unable to work. (R. 24).

The ALJ was not required to accept all of Mangan's alleged MS symptoms based on the fact that she suffers from that disease. A claimant can have a diagnosed condition without experiencing all, or even most, of the symptoms that could potentially stem from

---

[4] Mangan further stated in a January 2010 report that she prepared "complete meals," cleaned and did laundry, cared for her children ("I do everything for them"), and did "everything" she did before her onset date with periodic rests. (R. 159-66). The Court does not rely on this report because the ALJ did not cite it.

it. A claimant can also have symptoms that vary in their intensity and frequency. *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005); *Boyd v. Astrue*, 2009 WL 5149136, at *9 (N.D. Ill. Dec. 28, 2009) ("[T]he fact that plaintiff has a condition that can cause certain symptoms does not mean that the condition has caused those symptoms in a particular case."); *Brinkman*, 2013 WL 120250, at *6.

Mangan claims along the same lines that the ALJ did not properly consider that she was prescribed an immune modulator, experiences headaches, and has tingling in her spine. These allegations fail to show how the ALJ improperly assessed Plaintiff's credibility. The ALJ noted – correctly – that Mangan's MS medication had been relatively successful in controlling her symptoms. (R. 24). The ALJ also accounted for Mangan's numbness, her inability to stand for long periods of time, and the tingling in her back that stemmed from a small disc protrusion. The ALJ duly noted that Dr. Tieman concluded that Plaintiff had normal lower and upper body strength, a normal gait, and a full range of motion.

Plaintiff also fails to explain why the ALJ's consideration of her headaches undermines the credibility assessment. The ALJ noted Mangan's headaches three times in her decision, and she questioned Plaintiff about it at the hearing. Mangan claims that the ALJ failed to note that the headaches were consistent with the diagnosis of MS. However, Mangan does not cite any part of the record as evidence that her headaches were caused by MS. She stated at the hearing that she did not know if that was the case. (R. 495). Dr. Pula's January 2011 treatment note described the headaches as "tension type + musculo-skeletal." (R. 428). Moreover, the important question is not what caused the headaches, but whether Mangan's symptoms were so severe that the ALJ erred in

finding that she was not credible in stating that she could not work because of them. Plaintiff's motion does not claim that she is limited in any way by her headaches. Her reply fails to mention headaches at all. This is not a ground for arguing that the ALJ improperly considered her headaches.

More puzzlingly, Mangan argues that the ALJ failed to identify the medical records that support the credibility finding. (Pl.'s Mot. at 6). She claims, for instance, that the ALJ either mischaracterized the record on her eye-related limitations or did not understand the evidence. This claim seriously misconstrues the ALJ's decision. The ALJ stated that Mangan's visual acuity had returned to a normal 20/20 level with treatment; her optic problems had been resolved; and Dr. Knupp had stated that she did not require further ophthalmologic treatment. (R. 24). The record fully supports these statements. Mangan is correct that the ALJ failed to cite a medical basis for her conclusion that any current vision problems that Plaintiff experienced stemmed from her failure to wear corrective glasses. But that does not change the fact that Plaintiff's alleged "blindness" was resolved with medication and that she failed to have her broken eyeglasses fixed for two-and-a-half years. The ALJ was entitled to cite this evidence as a basis for discounting Mangan's credibility. The Commissioner's motion is granted on the credibility issue.

### C.    The ALJ Failed to Explain the RFC Assessment

A claimant's RFC measures what an individual can do despite the restrictions that stem from her limitations. 20 C.F.R. § 404.1545(a)(1). As always, an ALJ must consider the restrictions imposed by all of an individual's impairments, even those that are not severe. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). When a claimant is obese, the ALJ must consider whether her condition causes any functional limitations, either singly

or in combination with other impairments. SSR 02-1p; *see also Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012). Determining the RFC is a legal decision rather than a medical one. 20 C.F.R. § 404.1527(d); *Thomas v. Colvin*, — F.3d —, 2014 WL 929150, at *4 (7th Cir. March 11, 2014)*.

Plaintiff claims that the ALJ failed to comply with SSR 96-8p's requirements by not giving a function-by-function assessment of her work-related capacities. This line of reasoning is misplaced. Courts have repeatedly rejected the idea that an ALJ must provide a function-by-function RFC analysis. *See, e.g., Knox*, 327 Fed.Appx. at 657 ("[T]he expression of a claimant's RFC need not be articulated function-by-function[.]); *Herrera v. Astrue*, 893 F. Supp.2d 933, 942 (N.D. Ill. 2012) ("SSR 96-8p requires the ALJ to consider, not articulate a claimant's RFC on a function-by-function basis.") (internal quote and citation omitted); *Wurst v. Astrue*, 866 F. Supp.2d 951, 962 (N.D. Ill. 2012); *Lewis v. Astrue*, 518 F. Supp.2d 1031, 1043 (N.D. Ill. 2007) (noting that the narrative discussion provision of SSR 96-8p "does not require a detailed function-by-function analysis"); *McMurtry v. Astrue*, 749 F. Supp.2d 875, 891 (E.D. Wis. 2010); *Jones v. Colvin*, 2013 WL 1407779, at *11 (N.D. Ill. April 8, 2013); *Amey v. Astrue*, 2012 WL 366522, at *12 (N.D. Ill. Feb. 2, 2012); *House v. Astrue*, 2012 WL 4482589, at *9 (N.D. Ill. Sept. 26, 2012); *Gibson v. Astrue*, 2011 WL 1542088, at *13 (N.D. Ill. April 22, 2011); *Vujnovich v. Astrue*, 2011 WL 1157499, at *14 (N.D. Ind. March 28, 2011); *Corder v. Barnhart*, 2004 WL 1381125, at *5-6 (N.D. Ill. May 10, 2004).

Instead of the functional analysis that Plaintiff claims is necessary, an ALJ satisfies SSR 96-8p's discussion requirement by reviewing a claimant's symptoms and the medical

records.  *Knox*, 327 Fed.Appx. at 657.  Mangan alleges that the ALJ failed to do so in this case, in part, because she did not properly discuss and analyze all of the record.  As discussed earlier, however, the ALJ's decision reviewed the greater part of the medical record concerning Mangan's vision, MS, and back pain.  The ALJ did not account for every piece of evidence, but she was not required to do so.  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Plaintiff has not made any showing of why the ALJ would have reached a different conclusion had she provided a more complete analysis of the record.  *See Tenhove v. Colvin*, 927 F. Supp.2d 557, 571 (E.D. Wis. 2013) ("More importantly, she offers no explanation as to how the ALJ's putative violation of SSR 96-8p's narrative requirements impacted [her] step four determination.").

Instead, Plaintiff claims that the ALJ erred by relying on the state-agency experts to assess the RFC without first weighing the other medical opinions of her physicians.  The Commissioner takes the opposite view by claiming that the ALJ properly relied on Dr. Bilinsky's and Dr. Dow's conclusion that Mangan could work at the medium exertional level.  The state-agency doctors stated that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand, sit, and walk six hours during a workday; and had an unlimited ability to push and pull.  No postural or environmental limitations were noted.  (R. 384-91, 420-22).  The ALJ stated that she accepted these medical opinions and gave them significant weight.  (R. 24).  The Commissioner argues that, even if the RFC of light work is erroneous, it would make little sense to remand when the state agency physicians determined that she could perform the more onerous tasks of medium work.

The Court disagrees with both parties' positions.  Plaintiff cannot claim that the ALJ overlooked other medical opinions because no such expert reports exist.  The record

contains mostly routine treatment records, but these do not constitute medical source "opinions." Indeed, Mangan does not even identify any of the specific medical statements that she claims the ALJ should have weighed.

The Commissioner is also incorrect in claiming that the ALJ's RFC was based on Dr. Bilinsky's report. The Court recognizes, of course, that the ALJ gave significant weight to the state agency report. However, both the Commissioner and Mangan overlook that the RFC rejected most of that expert's major findings. Dr. Bilinsky believed that Mangan could perform medium work; the ALJ limited her to light work. Dr. Bilinsky found that no postural limitations were necessary; the ALJ stated that Mangan could frequently balance, stoop, kneel, crouch, or crawl. Dr. Bilinsky did not find any environmental restrictions; the ALJ limited Plaintiff to all exposure to extreme cold and heat, wetness, humidity, moving machinery, and unprotected heights.

As these findings demonstrate, the ALJ's decision rests on a logical contradiction: she both accepted Dr. Bilinsky's RFC *and* determined that the evidence supported a significantly different conclusion. The important question is how the ALJ explained her reasons for reaching this decision. An ALJ must discuss how the record supports the limitations included in the RFC. SSR 96-8p; *Knox*, 327 Fed.Appx. at 657. The ALJ gave two reasons for modifying Dr. Bilinsky's RFC: (1) the "likelihood of some residual effects" stemming from Plaintiff's MS, and (2) Mangan's "combined impairments." (R. 24). Obesity was clearly the source of the second ground because the ALJ stated at Step 2 that obesity was included in the RFC as "a contributing factor to [Mangan's] decreased functional abilities." (R. 21).

Unfortunately, the ALJ failed to provide any explanation of her reasoning, or to draw

any connection between the RFC conclusions and the record. Both of the state agency physicians considered the limiting effects of Mangan's MS. Neither of them, however, suggested that Plaintiff would experience any residual effects from MS or that the record warranted a more limited RFC. The ALJ did not look beyond the state-agency doctors to find that any other physician had stated that Mangan was likely to experience any residual MS effects. Dr. Knupp stated in October 2010 that Mangan had a "residual small central scotoma" in her visual field testing. (R. 445). But Dr. Knupp did not find any limitations that stemmed from the residual scotoma. The ALJ cited the doctor's note, but only to reiterate that Plaintiff's vision was normal and that no further ophthalmologic intervention was needed. (R. 23).

None of Mangan's treating physicians assessed exertional, postural, or environmental restrictions stemming from MS. The ALJ's discussion implicitly underscores this point by repeatedly stressing, not that Mangan had limitations, but that she had normal physical and neurological functioning, fully-resolved visual acuity, and controlled MS symptoms. If the ALJ wished to give significant weight to Dr. Bilinsky and, at the same time, reject most of her conclusions, the ALJ was obligated to explain what evidence she considered to reach that decision. As it stands, the ALJ failed to build a logical bridge between the record and her conclusion on this issue.

The same line of reasoning applies even more fully to the ALJ's reliance on Mangan's obesity. Unlike MS, the state agency physicians did not consider Mangan's obesity as part of their assessment. The ALJ gave no indication at all as to how she considered the limiting effects of obesity or what evidence she relied on to find that it contributed to Plaintiff's functional limitations. Although a number of records reflect

Mangan's height (five feet and four inches) and weight (between 185 and 200 pounds), neither side claims that a doctor ever stated that Mangan was obese or expressed any concern that her weight was a contributing factor to her physical problems. Merely noting a patient's weight is not equivalent to a medical consideration of obesity.[5] *Norris v. Astrue*, 776 F. Supp.2d 616, 639 (N.D. Ill. 2011).

An ALJ is always required to explain her "decision such that it may be meaningfully reviewed." *Arnett*, 676 F.3d at 593 (discussing obesity). This applies to obesity in the same way as any other impairment. Social Security Ruling 02-1p states that an ALJ "will explain how [she] reached [her] conclusions on whether obesity caused any physical or mental limitations." SSR 02-1p. *See also* SSR 96-8p ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[ ]."). The fact that the RFC involves a legal decision reserved to the Commissioner does not relieve an ALJ from the duty to draw a logical bridge between the record and the RFC. *See Diaz*, 55 F.3d at 306 n.2; *Newell v. Astrue*, 869 F. Supp.2d 875, 891 (N.D. Ill. 2012).

The Court cannot follow the basis of the ALJ's reasoning on the limiting effects of Mangan's obesity. The Commissioner has not provided any explanation, stating only that

---

[5] That is not to say that SSR 02-1p does not authorize an ALJ to find on her own that a claimant is obese when the record lacks a medical diagnosis. *See* SSR 02-1p ("[I]n most such cases we will use our own judgment to establish the presence of obesity based on the medical findings and other evidence in the case record, even if a treating or examining source has not indicated a diagnosis of obesity."). The Ruling also defines Level I obesity as starting with a body mass index ("BMI") of 30. That is what the ALJ found here. (R. 21). The Court notes, however, that a BMI of 30 is not definitive for obesity. The Ruling provides that such a BMI may or may not indicate obesity, depending on the percentage of weight that is from muscle or fat. *See* SSR 02-1p.

the ALJ gave Mangan the benefit of the doubt on the RFC issues.  The problem with this claim is that Mangan never testified that she required any of the non-exertional limitations that the ALJ assessed.  Plaintiff did not state, for example, that she needed to avoid heat, cold, or moisture, and she said nothing about postural limitations.

An ALJ is not required to provide a function-by-function RFC assessment, but her discussion must still "include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion." *Eakin v. Astrue*, 432 Fed.Appx. 607, 611 (7th Cir. 2011).  The ALJ's decision does not refer to any objective or subjective evidence on these limitations.  Absent any meaningful explanation of why she modified Dr. Bilinsky's RFC, the Court finds that the ALJ failed to provide the narrative assessment of Mangan's functional capacity that SSR 96-8p requires.  Failing to explain how an ALJ arrived at the RFC conclusions is "in itself sufficient to warrant reversal of the ALJ's decision." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The fact that the objective record suggests that a claimant has fewer restrictions than the ALJ assessed does not prevent an RFC from being erroneous.  An ALJ is wrong both when he overlooks a claimant's restrictions and when he finds "that the individual has limitations or restrictions that he or she does not actually have."  SSR 96-8p.  Harmless error only exists if a court can state with great confidence that the ALJ would reach the same result on remand.  *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).  Without an explanation of what the ALJ relied on to reach her conclusions, the Court cannot say with confidence that she would reach the same decision on remand.  It certainly does not suggest that she would adopt the experts' RFC, as the Commissioner states.  This falls below the minimal level of articulation that is required.  Plaintiff's motion is granted on this

issue.

## IV.  <u>Conclusion</u>

For these reasons, Plaintiff's Motion for Summary Judgment [33] and the Commissioner's Motion for Summary Judgment [43] are granted in part and denied in part. The ALJ's decision is reversed, and this case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: May 13, 2014